IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

UNITED STATES OF AMERICA,　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　 )　Criminal No. 05-93-KI
　　　　　　　　　　　　　　　　)
　　vs.　　　　　　　　　　　　 )　OPINION AND ORDER
　　　　　　　　　　　　　　　　)
DAVID JACOB FEIGERT,　　　　　 )
　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　)

　　Karin J. Immergut
　　United States Attorney
　　David L. Atkinson
　　Assistant United States Attorney
　　District of Oregon
　　1000 S. W. Third Avenue, Suite 600
　　Portland, Oregon 97204-2902

　　　　Attorneys for Plaintiff

　　Whitney P. Boise
　　Hoevet Boise & Olson, P. C.
　　1000 S. W. Broadway, Suite 1500
　　Portland, Oregon 97205

　　　　Attorney for Defendant

Page 1 - OPINION AND ORDER

KING, Judge:

Defendant David Feigert is charged under 18 U.S.C. § 111(a) and (b) with using a firearm on December 7, 2004 to forcibly assault, resist, oppose, impede, intimidate, and interfere with an agent from the United States National Marine Fisheries Service ("NMFS") Office for Law Enforcement who was engaged in his official duties. Before the court is Defendant's Motion to Suppress (#40). For the reasons below, I deny the motion.

**FACTS**

The following facts were proven at an evidentiary hearing.

Feigert's charge is based on an altercation he had with special agents from NMFS, during which he allegedly drew a gun on the agents. After an investigation, the agents determined Feigert's identity and obtained arrest and search warrants. In particular, the agents wanted to locate the gun allegedly used during the altercation, a blue steel revolver with wood grips which was not a semi-automatic weapon. The warrants were executed on December 10, 2004 at Feigert's home in southeast Portland.

Special Agent ("SA") Dale Torgersen, the NMFS case agent assigned to the investigation, arrived at the home about five minutes after other agents had arrested Feigert. When SA Torgersen arrived, Feigert was standing on the sidewalk in handcuffs. Ten to twelve agents from NMFS and the FBI were nearby. The arrest occurred without incident.

Feigert started to explain to SA Torgersen about the location of a gun inside the house. SA Torgersen interrupted Feigert, escorted him to the agents' car, showed him the warrants, and *Mirandized* him. Feigert stipulates that his *Miranda* warning was adequate. SA Torgersen asked Feigert if he wanted to speak and Feigert replied, "No." Feigert was driven to the United States

PAGE 2 - OPINION AND ORDER

Marshal's office for processing, with SA Kehoe driving and SA Torgersen and Feigert in the back seat. There was little small talk during the drive for two reasons. Torgersen was not feeling well. He also wanted to avoid any problems on the admissibility of any statements made by Feigert. During that drive, Feigert made three statements.

Statement #1: Torgersen mentioned to Feigert that before he was *Mirandized*, Feigert started to say something about a gun. Torgersen asked Feigert if he would like to tell him now. Feigert replied that there was an unloaded nine millimeter in a blue duffle bag and that he had not loaded his gun for a long time because he did not need to shoot anybody lately.

Statement #2: Feigert made an unsolicited comment about his family. He does not challenge the use of this statement.

Statement #3: SA Kehoe asked SA Torgersen if the agents executing the search warrant had a good description of the gun for which they were searching. Feigert then said that there were two guns in the blue duffle bag, a 25 automatic and a 9 millimeter. The description of these two guns does not match the description of the gun the agents were trying to locate.

There was no other conversation with Feigert during the ten to fifteen minute drive. The agents made no threats and did not offer anything in exchange for Feigert speaking with them.

All parties agree that Feigert was in custody when he made these statements.

## DISCUSSION

Feigert asks the court to suppress Statements #1 and #3 because he contends that they were obtained in violation of his Fifth and Sixth Amendment rights.

The government does not intend to use Statement #1 in its case in chief so there is no need to determine if a *Miranda* violation occurred. The government seeks a ruling on whether

PAGE 3 - OPINION AND ORDER

Statement #1 is voluntary, however, so that it can use the statement for impeachment. The government also seeks a ruling on the voluntariness of Statement #3.

A statement taken in violation of *Miranda* may not be used substantively in the prosecution's case-in-chief but, if voluntary, may be used for impeachment should the defendant testify inconsistently. "If a defendant exercises his right to testify on his own behalf, he assumes a reciprocal obligation to speak truthfully and accurately. The Supreme Court has consistently rejected arguments that would allow a defendant to turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths." Pollard v. Galaza, 290 F.3d 1030, 1033 (9th Cir.) (internal quotation and citation omitted), cert. denied, 537 U.S. 981 (2002). If the statement was involuntary, however, it is excluded for all purposes. Id.

The government must establish the voluntariness of a confession by a preponderance of the evidence. United States v. Haswood, 350 F.3d 1024, 1027 (9th Cir. 2003). When considering whether a confession is voluntary, the court must consider the surrounding circumstances and the combined effect of the entire course of the officer's conduct on the defendant. Pollard, 290 F.3d at 1033 (confession resulting from an intentional *Miranda* violation was voluntary and could be used for impeachment). A confession is involuntary only if the police use coercive means to undermine the suspect's ability to exercise his free will. Id.

> The test of voluntariness is well established: Is the confession the product of an essentially free and unconstrained choice by its maker? . . . The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession.

Id. (internal quotation omitted). The court looks at the defendant's state of mind, the physical environment in which the statement was made, and the manner in which the defendant was questioned. Id.

Overreaching includes lengthy questioning, deprivation of food or sleep, physical threats of harm, and psychological persuasion. United States v. Kelley, 953 F.2d 562, 565 (1992). A confession can be voluntary even if it is the product of a drug or alcohol induced statement. Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir. 1989), cert. denied, 496 U.S. 938 (1990). A confession obtained by physical violence is *per se* involuntary; a confession obtained by psychological coercion is not. United States v. Miller, 984 F.2d 1028, 1030 (9th Cir.), cert. denied, 510 U.S. 894 (1993). When there is alleged psychological coercion, the issue is whether the defendant's will was overborne when he confessed. Id. at 1031. Deception does not render a confession involuntary. Id.

The questioning here was not lengthy, the environment was not unusual, there were no threats, and there were no promises or other inducements. The questions of the agents were simple and limited. The agents used no coercive means to undermine Feigert's will to stay silent. The government has met its burden to establish that Feigert made Statements #1 and #3 voluntarily. They may be used for impeachment purposes.

I will now turn to whether Statement #3 violated Feigert's *Miranda* rights.

Feigert argues that Statement #3 was a product of a question from an agent that was reasonably likely to elicit an incriminating response under the circumstances, even though the inquiry was directed at the other agent and not at Feigert. Feigert notes that SA Kehoe's inquiry to SA Torgersen was about the charged incident. Feigert also argues that the agents would have

PAGE 5 - OPINION AND ORDER

known that the search warrant would have described the gun with particularity so that the question between them was essentially a ruse to get Feigert to talk.

The government contends that the circumstances were not likely to elicit an incriminating response and that Feigert volunteered the additional information. The government also notes that Feigert talked about *two* guns in response to the agent's inquiry to the other agent about the description of a *single* gun.

Before law enforcement officials may question a suspect in custody, the officials must inform the suspect that he has a right to remain silent, that his statements may be used against him in court, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to questioning. Miranda v. Arizona, 384 U.S. 436, 479 (1966). A valid waiver of *Miranda* rights must be voluntary, knowing, and intelligent. United States v. Younger, 398 F.3d 1179, 1185 (9th Cir. 2005).

Because Feigert did not waive his *Miranda* rights, any statements he made in response to a custodial interrogation would have to be suppressed. Feigert made Statement #3 after SA Kehoe directed a question to SA Torgersen rather than to Feigert. Feigert relies on the definition of "interrogation" as refined in Rhode Island v. Innis, 446 U.S. 291, 100 S. Ct. 1682 (1980). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect". Id. at 301.

In Innis, a murder suspect, who had asked for a lawyer after being *Mirandized*, was being transported in the back of a police car. The three officers had been warned by their supervisor

PAGE 6 - OPINION AND ORDER

not to question the suspect, intimidate him, or coerce him in any way. The officers had the following conversation while driving the suspect:

> While en route to the central station, Patrolman Gleckman initiated a conversation with Patrolman McKenna concerning the missing shotgun. As Patrolman Gleckman later testified:
>
> "A. At this point, I was talking back and forth with Patrolman McKenna stating that I frequent this area while on patrol and [that because a school for handicapped children is located nearby,] there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves."
>
> Patrolman McKenna apparently shared his fellow officer's concern:
>
> "A. I more or less concurred with him [Gleckman] that it was a safety factor and that we should, you know, continue to search for the weapon and try to find it."
>
> While Patrolman Williams said nothing, he overheard the conversation between the two officers:
>
> "A. He [Gleckman] said it would be too bad if the little–I believe he said a girl–would pick up the gun, maybe kill herself."

Id. at 294-95 (internal citations omitted). The suspect interrupted the conversation to tell the officers to turn the car around so he could show them the gun's location. When the police car arrived back at the scene of the arrest, the supervisor again advised the suspect of his *Miranda* rights. The suspect said that he understood the rights but that he "wanted to get the gun out of the way because of the kids in the area in the school." The suspect then led the officers to the shotgun which was hidden under some rocks by the side of the road. Id. at 295. The Court held that the suspect was not "interrogated" within the meaning of *Miranda*. Id. at 302. The Court reasoned that the record did not show that the officers knew the suspect was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children. The

record also did not show that the officers knew the suspect was unusually disoriented or upset. The Court characterized the discussion as a few off-hand remarks rather than a lengthy harangue. Id. at 302-03.

The conversation overheard by Feigert is much less likely to elicit an incriminating response than the conversation overheard by the suspect in Innis. SA Kehoe said nothing that implicates any type of public safety concern, much less a danger to handicapped children. His question was also brief, as in Innis, as opposed to an extended discussion. I conclude that Feigert did not make Statement #3 in response to an interrogation. Accordingly, I do not suppress the statement.

## CONCLUSION

Defendant's Motion to Suppress (#40) is denied.

IT IS SO ORDERED.

Dated this   11th   day of June, 2005.

    /s/ Garr M. King  
Garr M. King  
United States District Judge